IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOSHUA NOBLES, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-1459-S-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

<u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>

Joshua Nobles (Plaintiff) seeks judicial review of a final decision by the Commissioner of

Social Security (Commissioner)[2] denying his claim for supplemental security income (SSI) under

Title XVI of the Social Security Act. (*See* docs. 1, 16.)  Based on the relevant filings, evidence, and

applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should

be **REMANDED** for reconsideration.

## I.  BACKGROUND

On July 22, 2015, Plaintiff filed his application for SSI, alleging disability beginning on

February 1, 2011. (doc. 13-1 at 268-73.)[3]  His claim was denied initially on December 30, 2015 (*Id.*

at 122), and upon reconsideration on March 10, 2016 (*id.* at 133).  On April 7, 2016, Plaintiff

requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 182.)  He appeared and

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

testified at a hearing on February 21, 2017, but the ALJ determined that Plaintiff should be referred for a consultative psychological evaluation. (*Id.* at 89.)

After the psychological evaluation was completed, Plaintiff appeared and testified at a second hearing before the ALJ. (*Id.* at 94-120.)  On May 25, 2018, the ALJ issued a partially favorable decision finding that Plaintiff was under a disability from July 22, 2015 through July 23, 2016, but was no longer disabled as of July 24, 2016, due to medical improvement. (*Id.* at 62-63.) She granted his claim for SSI benefits for the period between July 22, 2015 and July 23, 2016, and denied his claim for SSI benefits as of July 24, 2016. (*Id.*)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on July 27, 2018, and included new evidence.  (*Id.* at 12-38, 260-61.)  The Appeals Council determined that the new evidence did not provide a basis for changing the decision because it did not relate to the period at issue, and it denied his request for review on May 11, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6.)  He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A.    Age, Education, and Work Experience

Plaintiff was born on February 28, 1973, and was 45 years old at the time of the second hearing. (doc. 13-1 at 96, 268.)  He had completed the seventh grade and could communicate in English. (*Id.* at 98.)  He had no past relevant work. (*Id.* at 97-98.)

## B.    Medical, Psychological, and Psychiatric Evidence[4]

On July 27, 2015, Plaintiff re-established mental health treatment with Dallas Metrocare

---

[4]Because only Plaintiff's psychological and psychiatric impairments are relevant to the issue under consideration, physical medical evidence is noted only when it includes information relevant to the mental impairments.

Services (Metrocare), approximately five years after his last visit in March 2011. (*Id.* at 445.)  He had a history of major depressive disorder and wanted to restart medications and services. (*Id.*) The examining advanced practice nurse noted that he was adequately groomed, cooperative, alert, euthymic, and oriented, with normal speech, fair insight, fair judgment, good impulse, and no sign of psychotic features. (*Id.*)  He was restarted on Celexa and Trazodone. (*Id.*)

Plaintiff returned for follow-up on August 24, 2015, and was seen by Ha Vu, M.D. (*Id.* at 448-49.)  He reported that his anxiety and depression had improved on Celexa, but thought Trazodone was "a bit too strong." (*Id.* at 449.)  He lived with his mother and had dropped out of school in the eighth grade. (*Id.*)  Dr. Vu opined that Plaintiff was likely in special education when in school, but he had a demonstrated assessment of understanding. (*Id.*)  He noted that Metrocare continued working on diagnosing Plaintiff on the depression spectrum. (*Id.*)

On October 6, 2015, Plaintiff returned to Metrocare and reported being sad and depressed. (*Id.* at 452.)  He had missed a prior appointment because he had been diagnosed with cancer. (*Id.* at 450, 452.)  At monthly follow-up appointments in December 2015 and January through March 2016, his symptoms were noted as stable on his current medications. (*Id.* at 454-55, 955-626.)

On December 23, 2015, State Agency Psychological Consultant (SAPC), Lee Wallace, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 126-30.)  He found that Plaintiff's affective disorder was a severe medically determinable impairment, but that his alleged limitations were only partially supported by the medical evidence. (*Id.* at 127.)  Dr. Wallace opined that he was mildly restricted in his activities of daily living, he had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and he had no episodes of decompensation. (*Id.*)  He determined that Plaintiff did not have understanding and

3

memory limitations, but that he had sustained concentration and persistence limitations, and was moderately limited in carrying out detailed instructions, in maintaining attention and concentration for extended periods, and in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 128-29.) He had social interaction limitations and was moderately limited in accepting instructions and responding appropriately to criticism from supervisors, and he had adaptation limitations and was moderately limited in responding appropriately to changes in the work setting, in traveling in unfamiliar places or using public transportation, and in setting realistic goals or making plans independently of others. (*Id.* at 129-30.) Dr. Wallace also completed a mental RFC assessment and found that Plaintiff retained the mental capabilities to remember detailed but not complex instructions, make decisions, and adjust to routine changes in the workplace. (*Id.* at 130.)

On March 9, 2016, Michael O'Callaghan, Ph.D., another SAPC, reviewed the medical evidence and completed a mental RFC that mirrored Dr. Wallace's mental RFC. (*Id.* at 141-42.) His assessment of Plaintiff's mental limitations closely resembled Dr. Wallace's, except he found that Plaintiff had no adaptation limitations. (*Id.*) He also affirmed Dr. Wallace's opinion that Plaintiff's alleged limitations were not fully supported by the medical evidence. (*Id.* at 139.)

On March 15, 2016, Plaintiff presented to a licensed professional counselor (LPC) at Metrocare. (*Id.* at 964.) He reported increased depression, stress, and isolation due to chemotherapy treatment for cancer, and he also felt confused and angry after recently discovering that his father was not his biological father. (*Id.*) Plaintiff returned to the LPC for counseling sessions on April 8, April 28, and June 1, 2016 (*Id.* at 968-69, 973.). He reported increased worry and depression

because his mother was hospitalized. (*Id.*)  He also continued feeling stressed because of his health problems and family issues, but felt better after performing the coping skills taught by the LPC. (*Id.*) He returned to Metrocare on June 7, August 3, October 5, and November 2, 2016.  (*Id.* at 1035-43.)[5]

On December 19, 2016, Plaintiff presented to Zareena Raffi, M.D., the attending psychiatrist at Metrocare for a routine follow-up. (*Id.* at 1048-52.)  He reported that he was "not good," and that he had been off of his medications for two weeks after he missed his last appointment because he was homeless and did not have transportation. (*Id.* at 1048.)  He felt depressed, was irritable, and heard voices, but denied any suicidal or homicidal ideation. (*Id.*)  During a mental examination, Plaintiff was observed as having cooperative behavior, logical thought content, and organized thought process, with fair judgment, insight, and impulse control. (*Id.* at 1049-50.)  He had intact remote memory, normal attention and concentration, and congruent mood, but also reported psychosis, auditory hallucinations, and paranoid delusions. (*Id.* at 1050-51.)  Dr. Raffi assessed schizoaffective disorder bipolar type, and continued Plaintiff on Zoloft for depression, Trazodone for insomnia, and perphenazine for psychosis. (*Id.* at 1052.)

On March 23, 2017, Plaintiff presented to Barbara Fletcher, Psy.D., for a psychological evaluation. (*Id.* at 949-954.)  She reviewed his medical records from Metrocare and other medical providers from September 2015 to July 2016. (*Id.* at 949.)  Plaintiff was "physically unwell," had pain in his feet due to neuropathy, and his gait was slow and unsteady. (*Id.*)  He reported becoming homeless after his mother died and having lived with a family friend for the past six to seven months. (*Id.*)  He had poor reading skills, and he was unable to read his mail or magazines and newspapers, could not access the Internet, and required assistance completing forms. (*Id.* at 950.)

---

[5] There are no treatment notes from those encounters in the record. (*See id.*)

He also had poor math skills and was unable to count money or make change. (*Id.*) He had low motivation and would skip caring for personal hygiene until prompted by a friend. (*Id.*) He struggled with self-administering his medications due to the mental exertion of the task, and his friend would need to test his blood sugar, inject his insulin, administer his medications, and manage his appointments. (*Id.*) His friend also took care of the cooking, shopping, and housework. (*Id.*)

Dr. Fletcher conducted a mental status assessment and noted that Plaintiff had a depressed mood and constricted affect. (*Id.* at 951-52.) He incorrectly identified the month and the year and was unable to name the current President or any previous ones. (*Id.* at 952.) He could recall four digits forward and zero digits backward, and skipped multiple digits counting backward from ten to one. (*Id.*) Dr. Fletcher administered the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) and Plaintiff obtained a full scale IQ of 41, which was in the extremely low intellectual range. (*Id.* at 953.) She noted that he displayed poor effort during testing; the result was not considered valid and was inconsistent with his presentation or report of adaptive functioning. (*Id.*) On the Wide Range Achievement Test 4 (WRAT-4), Plaintiff's scores in reading, spelling, sentence comprehension, math computation, and reading composite were all at 1/10 of the 1st percentile, but the results were also not considered valid. (*Id.*) Dr. Fletcher diagnosed major depressive disorder, recurrent and severe (provisional), unspecified anxiety disorder, and substance addiction disorder in remission (provisional), with a guarded prognosis. (*Id.* at 954.)

Dr. Fletcher also assessed Plaintiff's ability to perform work-related activities, and determined that his affective disorder affected his ability to understand, remember, and carry out instructions, with "moderate" limitations in making judgments on simple work-related decisions and in understanding and remembering complex instructions, and "marked" limitations in carrying out

complex instructions and in making judgments on complex work-related decisions, as well as his ability to interact with others, with "marked" limitations in interacting appropriately with the public, supervisors, and co-workers and in responding appropriately to usual work situations and to changes in a routine work setting. (*Id.* at 946-47.)  She opined that Plaintiff had no impairments that would affect his abilities to concentrate, persist, or maintain pace and to adapt and manage oneself, but that he was unable to manage benefits in his own best interest. (*Id.* at 947-48.)

On March 2, 2018, Dr. Raffi completed a "Medical Assessment Of Ability To Do Work-Related Activities (Mental)" for Plaintiff. (*Id.* at 1054-56.)  He opined that Plaintiff had an "extreme loss of ability" to carry out detailed but uninvolved instructions; maintain regular attendance and be punctual within customary tolerances; maintain concentration or attention/stay on task for an extended period (i.e., two hours at a time); act appropriately with the general public; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; behave in an emotionally stable manner; respond appropriately to changes in a routine work setting; cope with normal work stresses, including those inherent in low stress jobs, without exacerbating pathologically-based symptoms; and finish a normal workweek without interruption from psychologically-based symptoms. (*Id.* at 1054-55.) He also opined that Plaintiff had a "substantial loss of ability" to ask simple questions or request assistance and to maintain personal appearance. (*Id.*)  Dr. Raffi diagnosed Plaintiff with schizoaffective disorder, bipolar type, and indicated that the severity of his condition was evidenced by paranoia, chronic disturbance of mood, flight of ideas, racing thoughts, chronic depression, suicidal thoughts, and hallucinations/delusions. (*Id.* at 1055.)  He explained that he had considered Plaintiff's incidents of "doing well" when he assessed his limitations, and that they were consistent

with any symptom improvements in the clinical notes. (*Id.* at 1056.)  He anticipated that Plaintiff's condition and treatment would cause him to be absent from work more than four days per month, and that he had been limited to the same extent since he began treatment at Metrocare. (*Id.*)

## C.   <u>February 21, 2017 Hearing</u>

On February 21, 2017, Plaintiff testified at a hearing before the ALJ, and was represented by an attorney. (*Id.* at 69-93.)  He testified that he did temporary work for six or seven months, but did not remember when. (*Id.* at 75-76.)  He dropped out of school after the seventh grade because he was getting into trouble. (*Id.* at 76-77.)  He was convicted of selling drugs at age 18, served the full 15-year sentence, and was released from prison in 2003. (*Id.* at 77-78.)  He received a 3-year prison sentence in 2007 for selling drugs and was released in 2010. (*Id.*)  There were schooling programs at the prison, but he always got in trouble because he could not read or write and would get embarrassed. (*Id.* at 78-79.)  His mother would help him with paperwork and had completed his disability forms, but she passed away in October 2016. (*Id.* at 79.)  The disability form he recently filed was completed by a hospital social worker. (*Id.* at 79-80.)  He could count to 50, but was unable to read. (*Id.* at 84.)  He attended a drug treatment program when he was incarcerated and continued going to a similar program after leaving prison. (*Id.* at 86-87.)  He enjoyed the program and went to meetings on a regular basis. (*Id.*)  After his parents died, he "just wanted to give up on life" and join them. (*Id.* at 87.)  He had been taking medication for depression for about a year, and it would calm him down "a lot." (*Id.* at 87-88.)  He received his depression medication from Metrocare and went there often for counseling. (*Id.* at 88-89.)

At the end of the hearing, the ALJ informed Plaintiff that he was going to be referred to a psychologist for evaluation and testing to help determine his educational skills. (*Id.* at 89.)

**D.**    **March 21, 2018 Hearing**

On March 21, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 94-120.)  Plaintiff was represented by an attorney. (*Id.* at 96.)

**1.**    *Plaintiff's Testimony*

Plaintiff testified that he did not remember when he last worked. (*Id.* at 97-98.)  He had blurry vision and difficulty reading and would identify things by sight. (*Id.* at 98-100.)  He had dropped out of school in the eighth grade and did know if he was diagnosed with any learning disabilities at school. (*Id.* at 98-99.)  It would take him a long time to write a shopping list, and he could not understand written instructions without verbal explanation.  (*Id.* at 100-101.)  Before her death, his mother helped him with his medical appointments, and he relied on phone call reminders to attend his medical appointments. (*Id.* at 102.)  A port was inserted in his left side for chemotherapy, but he did not know if it was still there or if he still required more chemo. (*Id.* at 102-03.)  He had pain in his feet and was told his nerves were permanently damaged from chemo. (*Id.* at 103.)  He took Gabapentin, but it did not help with the pain and tingling in his feet.  (*Id.* at 103-04.)  He lived with a friend and her adult children. (*Id.* at 104-05.)  He checked his blood sugar once a day, and it was "two-something," but he lacked transportation to see his doctor for a Metformin refill. (*Id.* at 108.)  He could not stand more than 30 minutes because of his feet and could only sit comfortably for 30 minutes.  (*Id.* at 109.)  He experienced nightmares frequently and received new medication to control them.  (*Id.* at 110-11.) He took medication for depression but still had frequent crying spells. (*Id.* at 111.) He did not socialize with people because they made him nervous. (*Id.*)

**2.**    *VE's Testimony*

The VE testified that a hypothetical individual with no past work history and the same

background and educational experience as Plaintiff, who was limited to light or sedentary work and could climb ramps and stairs occasionally, but never climb ropes, ladders or scaffolds; could balance and stoop occasionally; could never work near hazards like unprotected heights and dangerous moving machinery; was limited to simple, routine, and low stress work, involving occasional decision-making and adapting to workplace change, with no fast-paced production work; and had occasional contact with the public, co-workers, and supervisors, could perform work, including small parts assembly (light and SVP-2) with 195,542 jobs nationally; sorter (light and SVP-2) with 150,000 jobs nationally; and hand packager (sedentary and SVP-2) with 21,630 jobs nationally, all of which were consistent with the DOT. (*Id.* at 112-13.)  All the jobs had minimal reading requirements and frequent near vision requirements, but they did not have fast-paced production quotas and did not require contact with the public. (*Id.* at 113-14.)  A person off task for 20 percent of the workday could not perform these jobs or any other job in the national economy. (*Id.* at 114.)  A hypothetical person that was unable to interact appropriately with supervisors or co-workers at least 25 percent of the time would not be able to perform any job in the national economy. (*Id.* at 116.)  None of the jobs identified by the VE required looking at written instructions, but might have required matching packages or boxes. (*Id.* at 118.)  A hypothetical person could not perform those jobs if his ability to maintain concentration for an extended period would cause him to be off task more than ten percent of the time. (*Id.* at 119.)

### E.    **ALJ's Findings**

#### 1.    *Disability Determination*

The ALJ issued a partially favorable decision on May 31, 2018. (*Id.* at 42.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since his onset date of July 22,

2015.[6] (*Id.* at 50.)  At step two, she found that from July 22, 2015 through July 23, 2016, he had the following severe impairments: diabetes mellitus with neuropathy, adenocarcinoma with surgical resection and chemotherapy, mood disorder, and anxiety disorder. (*Id.*) Nevertheless, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that, from July 22, 2015 through July 23, 2016, Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), with the following limitations: no climbing of ropes, ladders, or scaffolds and no more than occasional stooping, climbing of ropes or stairs, or exposure to hazards. (*Id.* at 50-51.)  Additionally, he could perform simple, routine work that was low stress involving occasional decision-making and occasional need to adapt to workplace changes, but never fast-paced production work, with no more than occasional interaction with co-workers and supervisors, and contact with the public not more than incidental to the work performed. (*Id.*) He also needed accommodation in being off task for 25 percent of the workday. (*Id.*)  At step four, the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 52.) At step five, the ALJ found that considering his age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 52.)  Accordingly, the ALJ determined that Plaintiff had been under a disability, as defined by the Social Security Act, from July 22, 2015 through July 23, 2016. (*Id.* at 53.)

### 2. *Termination of Disability Benefits*

The ALJ next found that since July 24, 2016, Plaintiff had not developed any new impairments, and that the nature of his severe impairments remained the same, except he was

---

[6]As noted, Plaintiff alleged disability beginning February 1, 2011, but he does not challenge the ALJ's onset date of disability.

"status-post surgical resection and chemotherapy associated with a history of adenocarcinoma." (*Id.* at 53.) She utilized the 7-step sequential evaluation process outlined in 20 C.F.R. § 416.994(b)(5) to determine whether Plaintiff's disability status should be continued or terminated. (*Id.*)

At step one, the ALJ determined that beginning July 24, 2016, Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations. (*Id.* at 54.) At step two, she found that medical improvement occurred as of July 24, 2016. (*Id.* at 58.) At step three, she found that the medical improvement was related to the ability to work because since July 24, 2016, there had been an increase in his RFC. (*Id.*) This finding dictated a skip to step five. *See* C.F.R. § 416.994(b)(5)(iii). At step five, she determined that beginning July 24, 2016, Plaintiff continued to have severe impairments. (*Id.* at 53.) Based on the impairments present as of July 24, 2016, the ALJ found at step six that Plaintiff had the RFC to perform light or sedentary work as defined in 20 C.F.R. § 416.967(b), except he could not climb ropes, ladders, or scaffolds, but could occasionally stoop or climb ramps or stairs; could not work with hazards; must be limited to simple, routine work that was low stress, involving occasional decision-making and need to adapt to workplace changes, but never fast-paced production work; and could have no more than occasional interaction with co-workers and supervisors, with contact with the public not more than incidental to the work performed. (*Id.* at 58.) The ALJ also determined at step six that Plaintiff did not have past relevant work. (*Id.* at 61.) At step seven, she found that despite his lack of past relevant work, considering his age, education, and RFC, as of July 24, 2016, there were other jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 61-62.) The ALJ concluded that Plaintiff's disability ended July 24, 2016, and he had not become disabled again as of that date. (*Id.* at 62-63.)

F.    <u>**New Evidence Submitted to the Appeals Council**</u>

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted the psychological assessment by Linda N. Cameron, Ph.D., dated January 1, 2019. (doc. 12-1 at 12-38.)

Dr. Cameron conducted a mental status examination and reviewed the medical records, including the treatment notes from Metrocare, Dr. Fletcher's psychological assessment dated March 23, 2017, and Dr. Raffi's March 2, 2018 medical source statement. (*Id.*) She administered the WAIS-IV and noted a full scale IQ of 51 and a general ability index of 54, which both fell in the mild developmental disability disorder range. (*Id.* at 17.) She also administered the WRAT-4 and found that Plaintiff's scores in word reading, sentence comprehension, spelling, math computation, and reading composite were all at the 0.1 percentile and in the mild developmental disability disorder range. (*Id.* at 18-19.) Dr. Cameron also administered the Millon Clinical Multiaxial Inventory (MCMI), and Plaintiff showed significance in multiple clinical personality patterns, including schizoid, avoidant, depressive, dependent, antisocial, and masochistic, as well as in clinical syndromes, including anxiety, dysthymia, substance dependency, post-traumatic stress, and major depression. (*Id.* at 20-24.) Dr. Cameron also administered the World Health Organization Disability Assessment Schedule 2.0 (WHODAS), and noted that Plaintiff required some assistance with testing given his low verbal skills. (*Id.*) The WHODAS yielded an average general disability score, including average domain disability scores in understanding and communicating, self-care, getting along with others, life activities, and participating in society. (*Id.* at 24-27.) Dr. Cameron diagnosed severe major depressive disorder, moderate generalized anxiety disorder, moderate posttraumatic stress disorder with dissociative features, mild intellectual developmental disorder, specific learning disorders in reading, written expression, and mathematics, and substance abuse

disorder in remission. (*Id.* at 27.) Her diagnoses also included personality disorder, with schizoid, avoidant, depressive, dependent, antisocial and self-defeating or masochistic traits. (*Id.* at 27-28.)

Dr. Cameron opined that "[t]he current clinical interview, medical record review, and objective personality (MCMI) testing of [Plaintiff] indicates the significant presence of both physical and mental problems that are affecting his ability to maintain competitive employment." (*Id.* at 28.) She noted that his current WRAT-4 results all fell "in the Mild Intellectual Developmental Disorder range and confirm[ed] the ranges reported by Dr. Fletcher in her 3/23/2017 testing," and that his significant mental problems "compromise[d] his cognitive skills and their use in job situations."(*Id.* at 29.)  She also noted that his medical records revealed significant mental problems, including major depression, significant anxiety, mood disorder, homicidal ideation, dysthymia, bipolar disorder, schizoaffective disorder, and substance abuse disorder. (*Id.* at 29.) Dr. Cameron  opined that Plaintiff's mental problems were affecting his ability to focus and concentrate, as evidenced by his current WHODAS and WAIS-IV results, as well as by Dr. Raffi's March 2018 medical assessment. (*Id.* at 31.)

Dr. Cameron also completed a medical assessment of Plaintiff's ability to perform work-related activities. (*Id.* at 35-38.)  She concluded that he could not perform the following activities independently, appropriately, effectively, and on a sustained basis in a regular work setting: remember work-like procedures; maintain attention for two hours; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods;

accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress, understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. (*Id.* at 36-37.)  She estimated that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month, and that his impairments lasted or were expected to last at least twelve months. (*Id.* at 38.)

The Appeals Council denied the request for review on May 11, 2019, finding that the new evidence did not relate to the period at issue, and therefore did not provide a basis for changing the ALJ's decision. (*Id.* at 5-6.)

## II.  LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

## A.    <u>Disability Determination</u>

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Termination of Disability Benefits**

Once a claimant qualifies for disability benefits and has received those benefits for a period of time, the Social Security Administration is required to review his case periodically to determine whether his previous disability status continues or should end. *See* 20 C.F.R. § 416.994(a); *Ames III v. Astrue*, No. 2:10-CV-0244, 2012 WL 931346, at *4 (N.D. Tex. Mar. 13, 2012), *adopted by* 2012 WL 946671 (N.D. Tex. Mar. 19, 2012). If the claimant's condition has improved, his eligibility to receive disability benefits may terminate. *See Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)

(citing 42 U.S.C. § 423(f)).

The Commissioner utilizes a seven-step sequential process for determining whether disability benefits should be terminated:

1.    Does the claimant have an impairment or combination of impairments that meets or medically equals the severity of an "impairment listing in appendix 1"? If so, the disability continues.

2.    If the claimant does not have a listed impairment, has there been a medical improvement?[7] If so, see step 3. If not, see step 4.

3.    Is the claimant's medical improvement related to his ability to do work? If not, see step 4. If so, see step 5.

4.    Does any exception to medical improvement apply? If one of the exceptions under 20 C.F.R. § 416.994(b)(3) applies, see step 5. If one of the exceptions under 20 C.F.R. § 416.994(b)(4) applies, the disability has ended.

5.    Are all of the claimant's current impairments in combination severe? If so, see step 6. If no, the disability has ended.

6.    Can the claimant do his past work? If not, see step 7. If so, the disability has ended.

7.    Can the claimant perform other work? If so, the disability has ended. If not, the disability continues.

*See* 20 C.F.R.§ 416.994(b)(5).  In a disability termination case, the Commissioner bears the burden of proof at all stages. *See Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).  The Commissioner must prove that the disability has ended and that the claimant is no longer disabled. *Id.*

## III.  ANALYSIS

A.    **Issues for Review**

Plaintiff presents five issues for review:

---

[7]A "medical improvement" is any decrease in the medical severity of any impairment that was present at the time of claimant's most recent favorable disability determination. *See* 20 C.F.R. § 416.994(1)(i).

18

1.      The ALJ gave little weight to the opinions of the State Agency medical consultants as to Plaintiff's residual functional capacity. The ALJ gave limited weight to the assessment of a consultative examiner as to Plaintiff's mental limitations, and gave little weight to the opinion of the treating psychiatrist. Thus, having rejected the medical opinions of record, the ALJ substituted her own medical judgment as to Plaintiff's physical and mental limitations and residual functional capacity. But the ALJ is not permitted to reject all of the medical opinions of record and substitute her own medical judgment to establish Plaintiff's residual functional capacity. Did the ALJ properly determine Plaintiff's residual functional capacity after rejecting all the medical opinions of record?

The Plaintiff maintains that the answer is ["]No."

2.      The ALJ acknowledged that the record establishes a diagnosis of borderline intellectual functioning but then maintained that there is no diagnosis of a cognitive or intellectual disorder. Further, the ALJ failed to include borderline intellectual functioning as a severe impairment (using an improper definition of "severe"), nor did the ALJ explain why borderline intellectual functioning was not present or did not affect Plaintiff's ability to work. Did the ALJ properly consider all of Plaintiff's limitations in determining residual functional capacity (RFC)?

The Plaintiff contends that the answer is "No."

3.      The ALJ maintained that the opinion of the consultative examiner was not entitled to weight, because the examiner failed to articulate whether her assessment took into account the effects of substance abuse or poor effort. However, the ALJ never recontacted the consultative examiner to resolve this issue. Did the ALJ properly develop the record by speculating that the opinion of the consultative examiner was not entitled to significant weight because it failed to consider either Plaintiff's history of substance abuse disorder (which the ALJ found to not be a contributing factor material to the determination of disability) or poor effort?

The Plaintiff asserts that the answer is "No."

4.      The report of a psychological evaluation dated subsequent to the ALJ decision was presented to the Appeals Council. The Appeals Council found that "[t]his additional evidence does not relate to the period at issue." But the psychological examiner reviewed the findings of the consultative examiner and determined that the results she had obtained through psychological testing confirmed the findings of the consultative examiner. Did the Appeals Council properly determine that the post-hearing psychological evaluation

19

was not relevant to the issue of disability through the date of the ALJ's decision?

The Plaintiff submits that the answer is "No."

5.    Having acknowledged that the Plaintiff has no past relevant work, the burden shifted to the Commissioner to establish the existence of work which the Plaintiff can perform. The ALJ attempted to carry this burden by the testimony of a vocational witness (VE). But the VE testimony is inconsistent with the limitations described by the ALJ in the hypothetical question. Did the Commissioner properly establish the existence of work, in significant numbers, which the Plaintiff can perform?

The Plaintiff argues that the answer is "No."

(doc. 16 at 2-3.)

**B.    New Evidence to Appeals Council**[8]

Plaintiff argues that the Appeals Council erred when it refused to consider newly submitted evidence. (doc. 16 at 18-19.)

When a claimant submits new and material evidence that relates to the period before the date of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review. *See* 20 C.F.R. § 416.1470(b). The regulations do not require that the Appeals Council discuss the newly submitted evidence or to give reasons for denying review. *See Sun v. Colvin*, 793 F.3d 502, 511 (5th Cir. 2015). New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering the Appeals Council's decision must review the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an

---

[8]Although listed fourth, this issue is addressed first because it impacts all stages of the sequential processes for the initial determination of disability and for the termination of disability benefits.

extent that the ALJ's decision becomes unsupported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006); *Morton v. Astrue*, No. 3:10-CV-1076-D, 2011 WL 2455566 at *7 (N.D. Tex. June 20, 2011) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).

Newly submitted evidence is material if (1) it relates to the time period for which the disability benefits were denied, and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Post-dated records may meet the first prong of materiality as long as the records relate to the time period for which disability benefits were denied. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (holding that new evidence of scar tissue related to the adjudicative period because it resulted from a prior surgery).

### 1.    *Relevant Time Period*

The Commissioner contends that the 26-page psychological assessment from Dr. Cameron, dated January 25, 2019, is not material because it post-dates the ALJ's decision by eight months, and "the relevant time period to establish disability is from [Plaintiff's] alleged onset date of February 1, 2011 through the date of the ALJ's decision on May 31, 2018." (doc. 17 at 15.)

As noted, the Appeals Council denied Plaintiff's request for review, explaining that the additional evidence did not relate to the period at issue and therefore did "not affect the decision about whether [Plaintiff] [was] disabled beginning on or before May 31, 2018." (doc. 13-1 at 5-6.) Even though Dr. Cameron's assessment is dated January 25, 2019, "the date of particular

information does not of itself dictate that the information is unrelated to the period before the ALJ rendered his or her decision." *Johnson v. Berryhill*, No. 4:16-CV-0241-O-BL, 2017 WL 2964882, at *6 (N.D. Tex. June 26, 2017), *adopted by* 2017 WL 2954914 (N.D. Tex. July 11, 2017); *see, e.g., Spano v. Berryhill*, No. A-16-CV-1309-AWA, 2017 WL 6520924, at *3 (W.D. Tex. Dec. 20, 2017) ("A treating physician's opinion is not facially invalid simply because it is outside the period the claimant was last insured."). The Fifth Circuit has long recognized that "[r]etrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can be used to establish disability onset dates." *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997). To be relevant, the retrospective opinion cannot simply express an opinion on the claimant's current status; it must clearly reference the relevant period of disability. *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (citing *Likes*, 112 F.3d at 191 and *Ivy v. Sullivan*, 898 F.2d 1045 (5th Cir. 1990)).

Dr. Cameron's psychological assessment was based, in part, on an examination of Plaintiff in January 2019, as well as a review of past medical records, including the treatment notes from Metrocare and the medical opinions of Drs. Fletcher and Raffi. (*See* doc. 12-1 at 13-17.) She administered several tests and evaluated Plaintiff's current mental impairments and compared those findings with Dr. Fletcher's assessment and the results from Plaintiff's performance on the WAIS-IV and WRAT-4. (*Id.* at 13-17.) She noted that "Dr. Fletcher's results indicat[ed] that [Plaintiff] fell in the mild intellectual development disorder IQ range in his overall IQ level, verbal skills, performance skills, and in his reading, math, and in his sentence comprehension skills as measured by these two tests." (*Id.* at 15.) She also noted that Dr. Fletcher considered the results "not valid," but that she did not explain why they were not consistent with his presentation or his report of

adaptive functioning. (*Id.* at 15, 28.)  Dr. Cameron determined that his current intellectual testing indicated that his overall IQ level on the WAIS-IV fell in the mild intellectual developmental disability range. (*Id.* at 17, 29.)  She noted that his current results were "slightly higher on some subtests, though not significantly, than those reported by" Dr. Fletcher, but that they "confirm[ed] the findings that she concluded were invalid." (*Id.* at 29.)  She pointed out that Plaintiff appeared motived to do well during his current assessment, and that his current results remained consistent with Dr. Fletcher's results despite indications of "poor effort" during testing in March 2017. (*Id.*)  She also referenced Dr. Raffi's medical assessment dated March 2018, and his opinions that Plaintiff had an "extreme loss of ability" to sustain concentration and persistence and that his ability to maintain concentration and attention for an extended time was "extremely affected," and found them consistent with his current WHODAS and WAIS-IV results. (*Id.* at 15-17, 31.)

Dr. Cameron considered the medical evidence during the relevant period, including the medical opinions of Drs. Fletcher and Raffi, and compared the evidence to her current assessment. (*See* doc. 12-1 at 28-32.)  Her assessment detailed how the current results were consistent with prior results and discussed the inconsistencies in Dr. Fletcher's opinion. (*Id.* at 28-29.)  Because portions of Dr. Cameron's opinion related to the adjudicative period, the Appeals Council was required to consider it to determine "whether the evidence created a reasonable possibility that it would have changed the outcome of the ALJ." *Johnson*, 2017 WL 2964882, at *7; *see Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994) (finding that a newly submitted report made after the ALJ's decision was material because at least part of it related to the time period for which the benefits were denied).

In determining that Dr. Cameron's assessment would not affect the ALJ's decision because it did not "relate to the period at issue," the Appeals Council did not discuss whether it had evaluated

the substance of Dr. Cameron's opinion, or whether its determination was based solely on its date. While "'[t]he regulations do not require the [Appeals Council] to provide a discussion of the newly submitted evidence or give reasons for denying review,'" remand may be required "if it is unclear whether the [Appeals Council] evaluated the new evidence." *Nejmeh v. Colvin*, No. 4:14-CV-816-Y, 2016 WL 642518, at *2 (N.D. Tex. Feb. 18, 2016) (quoting *Sun*, 793 F.3d at 512) (emphasis omitted). "[T]he failure of the [Appeals Council] to consider and evaluate newly submitted evidence that relates to the relevant time period is reversible error." *Johnson*, 2017 WL 2964882, at *7; *see, e.g., Negus v. Commissioner of Soc. Sec.*, No. 4:12-CV-643, 2014 WL 1267259, at *8 (E.D. Tex. March 27, 2014) (finding the Appeals Council erred in failing to consider examining physician's opinions completed after the ALJ's decision, when the physician specified that his opinion reflected the claimant's limitations during the relevant time period); *Luckey v. Colvin*, No. 4:14-CV-594-CAN, 2016 WL 429962, at *6 (E.D. Tex. Feb. 4, 2016) (remanding where the Appeals Council found that a physician's report issued after the ALJ's decision did not relate to the applicable time period, even though the physician noted that the physical limitations she found existed within the time period for which disability benefits were denied).

### 2.    *Reasonable Probability of a Different Outcome*

The Commissioner argues that even if Dr. Cameron's assessment was considered, Plaintiff has not shown a reasonable possibility that the new evidence would have changed the outcome of disability determination. (doc. 17 at 15-16.)

As discussed, newly submitted evidence that relates to the proper time period is not material unless it also creates "a reasonable possibility that it would have changed the outcome of the [Commissioner's] decision." *Thomas v. Colvin*, 587 F. App'x 162, 165 (5th Cir. 2014) (per curiam);

*see also Johnson*, 2017 WL 2964882, at *5 ("Of course, evidence may be immaterial even if it relates to the proper time period.").

Here, after the ALJ found Plaintiff disabled from July 22, 2015 through July 23, 2016, she proceeded to determine whether his disability continued or had ended. (*See* doc. 12-1 at 53-63.) When considering whether Plaintiff's mental impairments met or medically equaled the criteria of two listed impairments, the ALJ attributed limited weight to Dr. Fletcher's testing results based, in part, on Dr. Fletcher's comment that "the claimant's effort during testing appeared poor and the result was not consistent with his presentation or his report of adaptive functioning." (*Id.* at 57.) The ALJ referenced these results and validity concerns and found that Plaintiff had a "moderate limitation" in understanding, remembering, or applying information and in concentration, persistence, or maintaining pace. (*Id.*) While she found that Plaintiff had a "marked" limitation in interacting with others, the paragraph B criteria were not satisfied because his mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, and she ultimately found that his disability had ended on July 24, 2016. (*Id.* at 57, 62.) The results of Dr. Cameron's tests in January 2019 were similar to Dr. Fletcher's results from March 2017. (*Id.* at 17-28.) She reviewed the medical records from the relevant period and addressed the validity concerns raised in Dr. Fletcher's opinion. (*Id.* at 13-16, 28-32.) Given the significance the ALJ placed on Dr. Fletcher's opinions when considering the listed impairments, there is a reasonable possibility that Dr. Cameron's assessment would have changed the Commissioner's decision, as the ALJ had already found one "marked" limitation, and a second "marked" limitation would have satisfied the paragraph B criteria for a listed impairment. *See* 20 C.F.R. § 416.994(b)(5)(i) (if the claimant's impairment meets or medically equals a listed impairment, the claimant's disability continues). If the Appeals

25

Council had considered and evaluated the materiality of Dr. Cameron's opinion, "a reasonable possibility exists that it would have found the evidence material and remanded the matter to the ALJ for further consideration in light of the newly submitted evidence." *Johnson*, 2017 WL 2964882, at *5 (concluding that opinion of treating physician that post-dated the ALJ's decision was material and significant because it was the only opinion of plaintiff's work-related abilities, and the Appeals Council's failure to consider it warranted remand).

Because portions related to the adjudicative period, and a reasonable possibility exists that Dr. Cameron's opinion would have changed the disability determination, it was material and should have been considered by the Appeals Council. *See Castillo*, 325 F.3d at 551-52. Where, as here, the new evidence is so inconsistent that it undermines the ultimate disability determination, remand to the Commissioner is necessary to properly consider the evidence. *See Luckey*, 2016 WL 429962, at *6 (remanding where the Appeals Council improperly rejected physician's opinion as not related to the relevant time period and failed to review the evidence under the appropriate standard); *Powell v. Colvin*, No. 3:12-CV-1489-BH, 2013 WL 5433496, at *10-11 (N.D. Tex. Sept. 30, 2013) (finding new evidence submitted to Appeals Council that consisted of a treating physician's opinion that plaintiff had greater limitations than those determined by the ALJ had diluted the record such that the decision was not supported by substantial evidence). "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).[9] Because the new evidence diluted the record to the extent that the ALJ's decision became

---

[9]Plaintiff contends that the proper recourse is remand with instruction to award benefits. (doc. 16 at 22.) If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). The Commissioner, not the court, resolves evidentiary conflicts. *Newton*, 209 F.3d at 452. Inconsistencies and unresolved issues in the

unsupported, and because the Appeals Council committed error in evaluating it, remand is appropriate on this basis.[10]

## IV.  RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 21st day of September, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).  The record in this case is insufficient to remand with instruction to award benefits.

[10]Because this error requires remand, and the ALJ's consideration of the newly submitted evidence may affect the remaining issues, it is unnecessary to reach them.